(40 Misc. Rep. 110.)

MONEUSE v. RILEY et al.

(Supreme Court, Special Term, New York County. February, 1903.)

1. CORPORATIONS—ACTION BY STOCKHOLDER—FRAUD OF DIRECTORS—INJUNCTION—STOCKHOLDER.

Plaintiff sued a foreign corporation to compel it to account, and showed that he had been denied access to the books; that, though defendant directors had at the last annual meeting declared the corporation solvent, attachments were levied immediately after the meeting which rendered the company insolvent. The directors were unable to account for all the stock, but there was a discrepancy as to the amount which should be in the treasury. *Held*, that an injunction will be granted, as to property within the jurisdiction of the court, restraining the directors pendente lite from disposing of any of it, but that the exercise of the charter powers of the corporation would not be interfered with.

2. SAME—ACCOUNTING BY DIRECTORS.

Equity can compel directors of a corporation to account either on the theory of waste, gross negligence, or other wrongful acts, and protect a stockholder in the meantime by injunction.

3. SAME—JURISDICTION.

The proper tribunal for injunction against directors of a corporation to restrain the disposal of corporate productions and the receipt of debts due the corporation, or from mining, milling, or disposing of any ore or carrying on its business, is a court of general jurisdiction at the place of its domicile.

Action by Elie J. Moneuse against James B. Riley and others to compel an accounting. Motion to continue an injunction pendente lite. Granted.

Henry J. Mayer, for plaintiff.

James F. Mack (William Blaikie, of counsel), for defendants Riley and Crawford and the Copper Belle Mining Company.

J. Sidney Bernstein, for defendant J. A. Brunner.

Joseph N. Goldbacher, for defendant B. Brunner.

LEVENTRITT, J.   This is a stockholders' action, brought by the plaintiff on behalf of himself and others similarly situated, to compel an accounting by the defendant directors of the defendant Copper Belle Mining Company for their official conduct in the management of the affairs of the corporation.   The present motion is one to continue pendente lite a very sweeping injunction heretofore obtained restraining the defendant directors from disposing of their or the corporation's stock, receiving or issuing any, or in any wise dealing with the moneys, property, or assets of the corporation, or from operating, continuing, and carrying on the corporation's business of mining, milling, and smelting copper ore, and of running a company store in connection therewith.

The moving papers charge the defendants with fraud, misappropriation of assets, unauthorized stock issues to themselves, and, in general, with a conspiracy to wreck the corporation for their benefit. They charge that the defendants, while directors and officers of the Copper Belle Mining Company, without consideration, or for inadequate consideration, issued to themselves large blocks of stock, failing to account therefor; that they have dealt with the property of the corporation for their own benefit; that they have received commissions upon the selling price in the market for capital stock sold; that they have voted to themselves large salaries; that they have loaned the funds of the company to other corporations without consideration; that they have refused advantageous offers for the property, and given an option for an insufficient sum; that they have denied access to or inspection of the books; that at the last annual stockholders' meeting, and continuously theretofore, they had represented the company to be entirely solvent, when, in fact, as proved by the levying of attachments for large sums against the property of the company shortly after that meeting, the company was insolvent.   It is also charged that the directors transferred to the treasurer of the company stock of another mining company, the Copper King, taking in exchange, share for share, the company's stock, and subsequently selling, on behalf of the company, the Copper King stock at a nominal price per share.   Certain individual, illegal, unauthorized acts are also charged up against the defendants Riley and Crawford, primarily the former, who is accused by a former secretary and director of the company with depositing moneys received from the sales of corporate stock in his personal account.

Were all these charges substantiated there could, of course, be no question as to the plaintiff's right both to an account in the action and the continuance of the preliminary injunction.   A volume of affidavits is offered in support of the plaintiff's charges; a volume is offered denying them.   It has been a matter of considerable difficulty to sift the accusations and denials, to find what accusations are in fact denied, or what denials are effective.   On the other hand, many of the charges necessarily fall in that they are not made upon knowledge, or upon such disclosed information as would justify their acceptance.   Many of the plaintiff's statements, and those of his supporting affidavits, are necessarily on information, as the truth could only be disclosed upon an examination and inspection of the books, and

this has been denied him. So far as these statements or charges are concerned they must be rejected, as the court may not speculate or even infer the probability of their truth from the general scheme of the whole case as set out in the affidavits. Proof, not presumption, is required when the drastic remedy sought by this motion is involved. Rejecting these matters and certain others which, on the papers, it must be held the defendants sufficiently meet, there remain several important matters unexplained, and at least two items undisputed, which render a limited injunction pending the action proper.

I accordingly dismiss the questions of commissions, excessive salaries, loans to other corporations, refusal of advantageous offers for the property, and the question of options. I also dismiss the question of the unauthorized issue of stock to themselves in the first instance. On the other hand, the explanation offered of the denial of right of access to the books is unsatisfactory. Seeking refuge in an unreasonable by-law of their own making is not evidence of that candor with which the defendants profess to meet the charges laid at their door. Nor is the explanation offered, that on advice of counsel a promised inspection was denied for fear that it was a mere "fishing" expedition, consonant with the defendant directors' attitude. In view of the proceedings leading up to the respective demands, and the iterated assertions that the books were honestly, regularly, and properly kept, and that there was nothing concealed or to conceal, it is difficult to see why the stockholder should be denied the right to "fish" for the truth. Nor is the explanation of the representation of solvency of the corporation at the time of the last annual stockholders' meeting, when attachments were levied almost immediately thereafter, satisfactory. To say that the manager or superintendent of the mine or store had not informed the two directors who practically had the exclusive management of the corporation in their hands, and one of whom had but returned from the mines, whither he had gone to make a thorough examination of its affairs, is, to say the least, to confess inefficient management.

Again, the so-called Copper King transaction, above referred to, is not met in a manner required by the very circumstantial and detailed nature of the charge laid. One of the two denials made by the defendants Riley and Crawford—there is none at all by the defendant Brunner—comes dangerously near being a negative pregnant, while the other, denying that any such transaction as alleged ever took place, is not very much more satisfactory. There is no statement that "no" dealings or transactions or transfers were ever had with Copper King stock, or, if there were in fact, what was the nature of the deal. This, in frankness, should have been stated, in view of the affiant Barnes' allegations that, after he had surrendered to the defendant Crawford a certificate of Copper King stock for the purpose of exchange, another certificate for the same number of shares, but differently numbered, was afterwards returned to him as his original, with the statement that it could not be disposed of.

There are other inadequate denials, as, for instance, that of the charge that the defendant Riley had deposited corporation moneys in his own account; but those adverted to are sufficient for the pur-

pose of showing that the opposing papers, while profuse in denials, do not in many instances meet the allegations in the manner which their serious nature would seem to call for. Were the granting of any relief, however, dependent merely on the facts so far outlined, I do not think we should be on sufficiently firm ground. But, taken in connection with what is about to be set forth—in itself good ground for granting some relief—they acquire, perhaps, on these papers at least, a different significance, and make out a case for the plaintiff.

It is true the defendants Riley and Crawford deny that they have not accounted for every share of corporate stock, and, in different parts of their very voluminous affidavits, deny various allegations in that regard with more or less detail. But mere pro forma denials are not always sufficient to bring a case within the rule that, where all the equities of the complaint and affidavits are denied, an injunction cannot issue. Where affirmative matter set up by the defendants negatives by necessary deduction and inference their own denials, those denials fall to the ground, and the court is in a position to test the truth on their own affidavits, without resorting to the dangerous practice of seeking it, on motion, out of the allegations and denials of moving and opposing papers.

On their own statements, I find that the defendants have not accounted for all of the corporate stock. It appears practically undisputed that the entire manipulation of the stock issues, transfers, etc., was in the exclusive charge of the defendants Riley and Crawford. Although there were two other directors, the defendants Brunner, one of whom was nominally president for a period of time, their affidavits, as well as the whole case as submitted, satisfy me that Riley and Crawford, and especially Riley, ran the corporation. Brunner, the erstwhile president, swears that he never acted of his own initiative, doing simply what Riley told him to do, going even so far as to make out checks in blank and turning them over to Riley.

The defendants Riley and Crawford swear to two joint affidavits, setting forth, among other things, the history of the stock issues of the defendant Copper Belle Mining Company. They profess to account for the disposition of every share. Having had, as disclosed by the papers, control of the issue and distribution, they, if anybody, must know what has become of the shares, and contradictions and discrepancies in their statements must be taken against them. Their statements are not on information, but, necessarily, on knowledge.

It appears, then, that when the Copper Belle Company was formed, December 28, 1898, it was capitalized at $300,000, consisting of 300,000 shares of the par value of $1 each. Riley and Crawford swear that this entire issue went to Crawford in payment of certain mining claims, to be divided by him among Riley, the two Brunners, and himself, in proportion to their interests in these claims which he held as trustee; that only 60,000 of the 300,000 shares were in fact utilized for this purpose, and that at one time or other the balance—that is, 240,000 shares—were transferred to the treasury of the company for the purpose of realizing upon them, and thus to raise funds for the development and exploitation of the mines. Prior to July 23, 1900, every share of the 240,000 had been sold or disposed of, or, in the words of

Riley and Crawford, "all of the stock contributed to the treasury of said company had been sold and exchanged for property and services."

On or about the date last mentioned the capital stock was changed or increased from 300,000 shares of the par value of $1 each to 200,000 shares of the par value of $5 each. A basis of exchange was duly made and announced by the company, being two shares of the old, or $1 stock, for one share of the new, or $5 stock. Notices were sent to all the stockholders specifying a time—not disclosed in the papers—within which they would have to avail themselves of the option of exchange. Riley and Crawford swear that, as there were 300,000 shares of the old stock to be exchanged, "it took 150,000 shares of the new stock for the exchange." The conclusion is direct that Riley and Crawford meant by this statement that 150,000 new shares were in fact exchanged for 300,000 old shares. This is borne out by their immediately following statement: "This left 50,000 shares of the new stock in the treasury, which 50,000 shares are now in the treasury of the company." Accepting this latter statement as true, it incontestably appears from other portions of the same affidavit, directed to meet other charges in the moving papers, that less than 150,000 shares of the new stock were in fact issued, and that there should be more than 50,-000 shares of the new issue in the treasury. This appears from the following facts: The plaintiff charges that one Twomey or Toomey, a superintendent of the company, in January, 1899, received 6,000 shares of stock for services; that he was subsequently ousted, and transferred his shares to the defendant directors, when it was understood and agreed that this stock was to be returned to the treasury. Riley and Crawford in their affidavit admit the transaction, except that the 6,000 shares were in fact returned to the treasury of the company, "where they have ever since remained." It appears clearly that this stock was not exchanged, that the ex-superintendent failed to avail himself of the option, and that on account of his default the company was enabled to buy it in "at an amount greatly in reduction of its value and of the selling price of the stock at that time."

The defendants Riley and Crawford make similar allegations to meet other charges in the complaint, and affidavits as to about 10,000 other shares of the original stock held by certain parties in Boston, who, as they claim, like the ex-superintendent, failed to avail themselves of the option for exchange. They say: "The company bought in under the same conditions as the Toomey stock about 16,000 shares in all, inclusive of the Toomey stock." This stock was likewise "transferred to the company's treasury for the benefit of the company, where it has remained ever since."

It then appears, on their own statements, that at least 16,000 shares of the original issue, or $1 stock, were never offered in exchange for the new, or $5, stock, and, as the basis of exchange was one of the new for two of the old, that at least 8,000 shares of the $5 stock did not go out of the treasury to retire double the quantity of dollar shares. In other words, it did not take, as the defendants named allege, 150,000 new shares to retire 300,000 old shares, but only 142,-000 new shares, because only 284,000 old shares were offered and surrendered in exchange. And there were not merely 50,000 new

shares left in the treasury after the exchange had been consummated, but 58,000 shares. What has become of these 8,000 shares? The defendants Riley and Crawford, by their affidavits, allege that they were issued in exchange for 16,000 old shares, yet these very affidavits show that they were not.

It also conclusively appears that at least 7,000 of these 8,000 new shares, unaccounted for, were issued, but to whom, when, why, and for what consideration does not appear. Speaking of the present, Riley and Crawford swear that there are now "issued and outstanding 149,000 shares of stock of the Copper Belle Mining Company," or, in other words, that there are in the treasury 51,000 of the 200,000 new shares. After the exchange there must have been at least 58,000 shares. The discrepancy is not accounted for, and no explanation is offered by those who had the exclusive charge and control of the stock transactions, and who must be deemed to have known what became of them.

Further than this, the explanation as to what has become of the 16,000 old shares purchased, and which it is claimed went into the treasury of the company, is far from being satisfactory. Riley and Crawford allege that these were bought in on behalf of the company at a greatly reduced figure; "that a full statement of the transactions with respect to said stock so purchased by the company * * * was made to the stockholders' meeting next held after said transactions took place, * * * in which statement the Toomey stock and the other stock bought under like conditions of that of the Toomey was bought—in all, about 16,000 shares, as above set forth— was shown to be bought by the company, and charged to it and deposited for it in its treasury, a copy of which statement is hereto annexed and marked 'Exhibit A.' * * * Said Exhibit A is taken from the official minutes of the said stockholders' meeting held on the first day of May, 1902, which minutes are the official records of the company."

Turning to Exhibit A, which is entitled "Financial Statement of the Copper Belle Mining Company for One Year Ending March 31st, 1902," we find, under the head of "Disbursements," only three items of stock purchases as follows:

"June 30, '01, purchased 4300 shares of stock.................. 17,000
"Sept. 26,   "        "      1850  "    "    "  .................. 3,087 50
"Oct.  26,   "        "      1850  "    "    "  .................. 3,087 50."

Thus the official records of the company show total purchases of 8,000 shares for a total of $23,175. But this statement by which the defendants Riley and Crawford, for the purpose of this motion, at least, are bound, fails to account for one-half of the 16,000 shares. Nowhere in the statement is there any item of stock purchase beyond these 8,000 shares. What has become of the other 8,000? Further, the shares purchased were secured at approximately $3 per share, a valuation far in excess of that at which it is alleged the 16,000 shares were bought in. It might be maintained that these latter shares, being equivalent to 8,000 of the new shares, are entered as new shares in the books. To this it must be answered, first, that there is no allegation of the purchase of any new shares, and, secondly, that even

on that basis it would show a purchase price of approximately $1.50 per share, again a price far above par, instead of, as the defendants allege, greatly below it.   It is manifest that if the defendants' statements that, owing to the holders' failure to avail themselves of the option to exchange, their stock was subsequently bought in at a low figure, that is, less than $1 per share, is true, the items included in the statement are not the 16,000 shares of the original issue outstanding, and that these remain unaccounted for.

I deem it unnecessary to pursue further the inquiry into the facts.

Without further characterizing the acts of these defendant directors, I am of the opinion that the plaintiff makes out his case, and that he is entitled to injunctive relief.   Whether on the theory of waste, misappropriation, gross negligence, or other wrongful acts, equity can call the directors to account, and in the meanwhile protect the plaintiff and those situated similarly with him.   Toward the plaintiff and other shareholders the directors' relation is in the nature of trustee and cestui.   Brinckerhoff v. Bostwick, 88 N. Y. 52, 53.   "Equitable jurisdiction extends to all culpable acts and omissions of the directors by which the pecuniary interests of the corporation are or may be injured.   If they are treacherous to its interests and appropriate its property, or intentionally waste its assets,   *   *   *   they are liable to account in equity to the corporation or its representatives, not only for the money or property in their hands, but also for such as they fraudulently disposed of or wasted, as well as for the damages naturally resulting from their official misconduct."   Bosworth v. Allen, 168 N. Y. 157, 166, 61 N. E. 163, 55 L. R. A. 751, 85 Am. St. Rep. 667.

While I am of the opinion that an injunction is proper, it is clear that the preliminary injunction is too sweeping.   Under the decision of Hallenborg v. Greene, 66 App. Div. 590, 73 N. Y. Supp. 403, there can be no injunction restraining in effect the Copper Belle Mining Company, which is a foreign corporation, from the exercise of its charter powers.   The proper tribunal for an injunction against the disposal of corporate products and the receipt of debts and obligations due the corporation, or from mining, milling, or disposing of any ore or carrying on its business, is a court of general jurisdiction in Arizona.   It appears from the papers that a receiver has already been there appointed, and no order of this court would be effectual to control his actions.   The court can only act on the defendant directors who are by proper service within its jurisdiction, and on property located here.

The defendants should be enjoined from in any wise interfering with or disposing of the stock standing in their own names or under their control, especially with that deposited with the Knickerbocker Trust Company under the pooling agreement.   As to any other matters to which the injunction should be extended, I will hear counsel on the settlement of the order.

There is no force in the preliminary objection, as this application may be treated as an original motion for a new injunction.

Motion granted, as indicated.